IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIE BAILEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:12-CV-1800-N (BH) |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 20, 2012 (doc. 16), and *Defendant's Motion for Summary Judgment*, filed October 17, 2012 (doc. 17).  Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **DENIED**, the defendant's motion should be **GRANTED**, and the case should be wholly **AFFIRMED**.

## I.  BACKGROUND[1]

### A.    Procedural History

Willie Bailey (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act. (R. at 12-18.) On April 28, 2009, Plaintiff applied for Social Security Disability Insurance Benefits (DIB) and

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

Supplemental Security Income, alleging disability beginning on January 19, 2009, due to depression and bipolar disorder.   (R. at 164-73.)   His applications were denied initially and upon reconsideration.  (R. at 12.)  He timely requested a hearing before an Administrative Law Judge (ALJ).  (R. at 12.)  He personally appeared, with counsel, and testified at a hearing held on November 4, 2010. (R. at 12.) On December 14, 2010, the ALJ issued his decision finding Plaintiff was not disabled from January 9, 2010, through the date of that decision.  (R. at 12-18.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied his request on April 11, 2012, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)  He then timely appealed the Commissioner's decision to this court pursuant to 42 U.S.C. § 405(g). (doc. 1.)

B.     **Factual History**

    1.     **Age, Education, and Work Experience**

    Plaintiff was born on March 31, 1975. (R. at 164.) At the time of the hearing before the ALJ, he was 35 years old. (R. at 52.) He graduated high school and has past relevant work as a furnace operator, machine operator, and pressing machine operator. (R. at 12, 223.)

    2.     **Psychological and Psychiatric Evidence[2]**

    On December 16, 2005, and January 17, 2006, while incarcerated, Plaintiff underwent mental health reviews by "Correctional Managed Care" personnel.  (R. at 292–93.)  On both occasions, he was found not to have any "apparent mental health needs." (*Id.*)

    The next time Plaintiff sought mental health treatment was on February 4, 2009, when he visited the clinic at Lakes Regional Mental Health/Mental Retardation Center (LRMHMR). (R. at

---

[2]  Because this action only involves a mental impairment, the record does not contain any medical evidence.

2

303.) Plaintiff reported lack of motivation, anhedonia, and low energy, as well as episodes of mania, hearing voices, difficulty sleeping, paranoia, and seeing things "moving in the shadows." (R. at 304.) The evaluator, Donna Haynes, MSN, diagnosed the Plaintiff with Type I Bipolar Disorder, and deferred a diagnosis on Axis II, Personality Disorder and Mental Retardation. (R. at 307.)

On March 18, 2009, Plaintiff visited LRMHMR for a psychiatric evaluation by Donna Haynes, MSN. (R. at 365.) Ms. Haynes observed Plaintiff to be "motivated" and to possess "[g]ood insight," "[g]ood health," "[a]dequate social skills," a "[n]ormal support system" and "[n]ormal intelligence." (R. at 369.) The only non-normal or inappropriate conditions indicated were Plaintiff's "[i]nability to concentrate" and "[s]uspiciousness." (R. at 368.) Ms. Haynes recommended medication and service coordination as treatment. (R. at 369.)

Between 2009 and 2010, Plaintiff received psychosocial rehabilitation services from Blake Rogers, a qualified mental health professional (QMHP), focusing on social skills, coping skills, and daily living skills. (R. 314–16.) Plaintiff visited the LRMHMR clinic again on June 26, 2009, July 9, 2009, and August 27, 2009; each time, Ms. Haynes diagnosed him with Bipolar Disorder. (R. at 347, 353, 358.)

On July 22, 2009, Plaintiff underwent a mental status examination by Ronald Anderson, Ph.D., for the purpose of determining whether he had a disability. (R. at 336.) Dr. Anderson interviewed Plaintiff, and noted that he was a "good personal historian" throughout the examination. (*Id.*) Plaintiff reported that he was on five medications at the time, and that they were "helping some, because he was not as depressed as he used to be and was not having bad anxiety attacks either." (R. at 337.) Plaintiff was able to complete serial threes up to 30 and count down from 20, but Dr. Anderson found his remote, recent, and immediate memory to be "poor." (R. at 338–39.) Plaintiff

3

also rated both his depression and anxiety as 10's on 10-point scales. (R. at 338.) Plaintiff did not present those levels of depression or anxiety, and Dr. Anderson noted that the possibility of malingering by the Plaintiff "need[ed] to be considered." (R. at 338.)  Dr. Anderson ultimately diagnosed Plaintiff with alcohol dependency (in remission), Bipolar Disorder II (depressed type), and anxiety disorder, not otherwise specified (NOS). (R. at 339.)  Neither Dr. Anderson nor Plaintiff raised the issue of mental retardation.  (*See* R. at 336–40.)

On August 7, 2009, Jean Germain, Ph.D., a state agency consultant, reviewed Plaintiff's treatment record and completed a psychiatric review technique form (PRTF). (R. at 317.)  Dr. Germain evaluated Plaintiff with regard to listed impairments 12.04, 12.06, and 12.09 from the Social Security Regulations (found at 20 C.F.R., Part 404, Subpart P, Appendix I). (R. at 317.) Dr. Germain did not find that Plaintiff met any of the listed impairments, and she did not mention the possibility of mental retardation. (R. at 317.)

On October 28, 2009, Plaintiff underwent a psychological evaluation by Darrell Horton, Ph.D. (R. at 396.) Plaintiff's chief complaint for that examination was "Disably [*sic*]." (R. at 396.) Plaintiff was brought to the examination by his sister, and he appeared "slightly disheveled." (R. at 397.) Plaintiff claimed during this exam that he was in special education classes in high school, and that he had worked intermittently at a factory but had been fired. (R. at 396.) Dr. Horton did not consider Plaintiff "a very good personal historian for this interview." (R. at 396.)

Plaintiff reported "crying spells, avoid[ance of] people, disinterest[] in normally pleasurable activities, [] excessive anger, [] inability to concentrate, mood changes, insomnia, suicidal ideation, mania, loneliness, impulse control problems, hyperactivity, worry, delusions, and hallucinations," most of them to "an extreme degree." (R. at 397.) Dr. Horton observed that Plaintiff's "mentation

4

seemed slowed" and that he was oriented to "person, place, and time, and oriented to the environment." (R. at 398.)  Plaintiff could not remember the ages of his children. (*Id.*) He could recall three digits forward and two digits backward, and he could name the current president as well as two former presidents. (R. at 398.) He could not complete serial threes or sevens. (*Id.*) Plaintiff reported not doing any chores and that he "just s[at] at home." (R. at 399.)

Dr. Horton interviewed Plaintiff for personal and functional information, and he also asked him questions to test his mental functioning. (R. at 399–400.) He administered the WAIS3, IQ, and WRAT3 tests. (*See id.*) Dr. Horton also assessed Plaintiff's orientation, memory, concentration and attention, abstract thinking, and insight and judgment. (R. at 598.)  On his IQ test, Plaintiff scored a 58 in verbal skills, a 57 in performance, and a full scale score of 53.  (R. at 400.) In WRAT3 testing, Plaintiff scored 52 in reading, 52 in spelling, and 50 in arithmetic, all of which Dr. Horton found to be "consistent with [Plaintiff's] level of measured intelligence." (*Id.*)  Dr. Horton diagnosed Plaintiff with bipolar disorder, NOS; alcohol-related disorder, NOS; and "rule[d] out mild mental retardation." (R. at 400–01.) Dr. Horton noted that the Axis II diagnosis was "only to describe [Plaintiff's] current level of intellectual functioning based on test results," and that he believed Plaintiff's mental functioning had been higher previously, based on the history. (R. at 401.)

On December 30, 2009, Charles McDonald, Ph.D., completed a second PRTF, this time with the benefit of Dr. Horton's examination records.  (R. at 377.) He compared the record of Plaintiff's impairments to listings 12.04, 12.05, 12.06, and 12.09, and found that Plaintiff's impairments met none. (*Id.*)  He also opined that Plaintiff had mild to moderate issues with bipolar disorder, mental retardation, anxiety, and alcohol dependence, but he ultimately concluded that the overall impact of these disorders "[did] not wholly compromise the [his] ability to sustain some level of

employment." (R. at 389.)

Dr. McDonald also completed a Residual Functional Capacity (RFC) assessment. (*See* R. at 391.)  He found Plaintiff not to be significantly limited or "moderately limited" across all categories, except for his ability to understand and carry out detailed instructions, in which he had found a marked limitation. (R. at 391–92.)  He concluded that Plaintiff had the mental RFC to "understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods,[] interact with others, and respond to changes in the work setting." (R. at 393.)

On August 27, 2010, Plaintiff presented to Green Oaks Hospital, complaining of depression, hearing voices, and suicidal ideation. (R. at 458.)  He was diagnosed with bipolar disorder, NOS, severe with psychotic symptoms, and alcohol abuse in sustained full remission. (R. at 457.)  He was discharged the next day. (*Id.*)

### 3.    Hearing Testimony

On November 4, 2010, Plaintiff and a vocational expert testified at a hearing before the ALJ. (R. at 23–40.)  Plaintiff was represented by an attorney.  (R. at 25.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he had not been to LRMHMRC since June 2010, but he was scheduled to return on November 16, 2010.  (R. at 26.)  He did not know the names of his prescriptions. (*Id.*) He heard voices telling him "[t]o hurt people," but he had never actually hurt anyone, although he had tried to hurt himself by overdosing on his medication.  (*Id.*)  Plaintiff also saw "people that [were] not really there" and "shadows moving about," and LRMHMRC had not "been able to find the right prescription" to treat these symptoms. (R. at 27.)

Plaintiff sought treatment and was hospitalized at Green Oaks Hospital because he was

"having thoughts of suicide, hearing voices telling [him] to do things and [he] was ready to do it." (R. at 28.) Plaintiff was hospitalized for "one whole day," and physicians gave him "stronger" medications and instructed him to go to LRMHMRC if his symptoms returned. (*Id.*)

Plaintiff last used alcohol "maybe four, five years ago." (*Id.*) He had insomnia and needed medication to avoid staying up for "two or three days." (*Id.*)

Plaintiff was released from prison in 2006 and had been on parole, but he was off parole by the time of the hearing. (R. at 29.) He went to prison for a "DWI." (R. at 32.) During his incarceration, he went to a "school" that instructed him on "how to cope with the world once [he] got out" of prison. (R. at 39.) He lived with his sister and her boyfriend, but did not always get along with them. (R. at 29.) He only left the house about once a week, did not visit anyone, had no hobbies, did no chores, did not cook, and did not attend any social groups. (R. at 30.) He could bathe himself and take care of his personal grooming, but his sister "sometimes" had to remind him. (R. at 31.) He did not drive and did not have a driver's license. (*Id.*)

Plaintiff's doctors increased his dosage for "all of" his medications because "it wasn't working," but he did not feel better or notice any difference in his symptoms. (*Id.*)

The last time he worked was "two or three" years before, as a machine operator. (R. at 32.) He worked five days a week, but could not focus on the job and was eventually fired. (*Id.*) He also worked in landscaping for "a few months." (*Id.*)

He completed high school and was in special education classes, but he, his sister, and his attorney were unable to get his school records from his high school because they "[we]ren't there anymore." (R. at 32–33.)

Plaintiff's mental condition hurt him and prevented him from going out and doing things.

(R. at 33.)  It was as if his mind just "click[ed]," he did not know why but "[his] mind just click[ed]," he was "more comfortable by [him]self." (R. at 33–34.)

In response to a question by the ALJ, Plaintiff testified that he worked at a manufacturing company from "'07 to '09" but he was fired.  (R. at 35.)  He received unemployment benefits until December of 2009.  (*Id.*)  He looked for other work while receiving unemployment. (*Id.*)  The "biggest" reason he could not work was because he could not "comprehend nothing and I just [could not] get along with people." (R. at 38.)

### b.    *Vocational Expert testimony*

A vocational expert (VE) also testified at the hearing.  (R. at 38.)  The VE classified Plaintiff's past work as a machine operator as "medium, SVP 2."  (*Id.*) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform his past work if he had the following limitations: understand, remember, and follow simple "one-two-three-step" instructions, complete repetitive tasks, and no contact with the public. (*Id.*) The VE opined that the person could perform Plaintiff's past relevant work. (*Id.*)

The ALJ then changed the hypothetical to comprise a person who could not sustain a full eight-hour day or forty-hour work week on a consistent basis and was not able to relate to coworkers on a consistent basis. (R. at 39.) The VE testified that such a person could not perform any type of work.  (*Id.*)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on December 14, 2010.  (R. at 12–18.) He first found that Plaintiff met the insured status requirement through June 30, 2011. (R. at 14.) He then found at step one that Plaintiff had not engaged in any substantial gainful activity (SGA) since his

alleged disability onset date of January 19, 2009.  (R. at 14.)  At step two, he found that Plaintiff's

bipolar disorder and alcohol abuse were severe impairments.  (R. at 14.)

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any

impairments listed in the regulations.  (R. at 14.)  Before proceeding to step four, the ALJ

determined Plaintiff had the following RFC: ability to perform "a full range of work at all exertional

levels" and  "understand, remember and follow simple 1,2,3 instructions and complete repetitive

unskilled tasks and he requires non-public work." (R. at 16.)

The ALJ determined, based on the vocational expert's testimony, that Plaintiff could perform

his past relevant work as a landscape worker and machine operator. (R. at 17.)  He therefore

concluded that Plaintiff was not disabled from January 19, 2009, through the date of his decision.

(R. at 18.)

## II.  ANALYSIS

**A.**    <u>**Legal Standards**</u>

**1.**    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to

10

be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**3.      Standard for Finding of Entitlement to Benefits**

Plaintiff asks the Court to reverse and remand the Commissioner's decision "for an award of benefits," or to remand "for additional administrative proceedings."  (Pl. Br. at 6-7.)

If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.    Issues for Review**

Plaintiff presents one issue for review:

Whether or not the ALJ erred in not evaluating Plaintiff's intellectual functioning under listing 12.05B.

(Pl. Br. at 1.)

**C.    Listing 12.05: Mental Retardation**

Plaintiff argues that remand is required because the ALJ erred at step three of the sequential evaluation process by failing to find that he was disabled under listing 12.05B (mental retardation). (Pl. Br. at 1.) He argues in the alternative that he should be found disabled under listing 12.05C. (*Id.* at 6.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, at step three the ALJ must determine whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[3] *Compton v. Astrue*, No.

---

[3] These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

12

3:09-CV-0515 B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d) (2012). The claimant has the burden of proving that his impairment or combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that his unlisted impairment or combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to *all* the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2).

Listing 12.05 contains "an introductory paragraph with the diagnostic description for mental retardation" and "four sets of criteria (paragraphs A through D)":

12.05 Mental retardation:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR

B. A valid verbal, performance, or full scale IQ of 59 or less; OR

13

   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a
physical or other mental impairment imposing an additional and significant
work-related limitation of function;OR

   D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting
in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or
    pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2013).

   Here, Plaintiff contends that he meets the requirements for listing 12.05B because of his low

IQ scores during Dr. Horton's examination (58 in verbal, 57 in performance, and 53 in full scale).

(Pl. Br. at 4.)  Although these scores meet the threshold in paragraph B of listing 12.05, the IQ

threshold is not the only requirement.  *See id.* Plaintiff must also show he meets the requirements

in the introductory paragraph (or diagnostic description of mental retardation).[4] *Randall v. Astrue*,

570 F.3d 651, 659 (5th Cir. 2009).  He faces the "very high burden"of showing that the ALJ erred

in failing to find that before he turned 22, he suffered from mental retardation, i.e., "significantly

subaverage general intellectual functioning with deficits in adaptive functioning." *See* § 12.05;

*Armstrong*, 2009 WL 3029772, at *11.

   Plaintiff relies on his testimony that he was enrolled in special education classes in high

school to show that he had significantly subaverage intellectual functioning and deficits in adaptive

behavior before age 22.  (R. at 33.)  As the trier of fact, the ALJ could weigh his testimony against

---

   [4] The terms "diagnostic description" and "introductory paragraph" refer to the requirement that the claimant
exhibit "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested
during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."
*See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00A.

contrary evidence, such as Dr. Horton's expert opinion "ruling out" mental retardation and Dr. McDonald's and Dr. Germain's consultative findings that Plaintiff did not meet Listing 12.05. (R. at 317, 377, 401.)  In doing so, the ALJ found that Plaintiff had not met his burden under Listing 12.05.  *Compare to Abernathy v. Astrue*, 7:11-CV-116-O-KA, 2012 WL 2423106 (N.D. Tex. May 15, 2012) *rec. adopted*, 2012 WL 2458059 (N.D. Tex. June 27, 2012) (remanding on ALJ's failure to find in favor of claimant on Listing 12.05 where the record showed two separate occasions, before age 22, in which claimant had tested under the IQ threshold and had been evaluated as having adaptive deficiencies).[5]

Further, the regulations instruct that a "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.A. § 423(d)(3) (West 2004). Because Plaintiff points to no clinical or laboratory evidence showing he exhibited the symptoms described in the introductory paragraph, he has failed to meet his burden to show that his mental impairment met the severity requirements of Listing 12.05.

The ALJ's step three finding that Plaintiff had not met his burden to show his mental impairments met or medically equaled a listed impairment is supported by substantial evidence. Accordingly, remand is not required.[6]

---

[5] The Commissioner argues at length that the evidence of record does not support Plaintiff's argument that he meets Listing 12.05.  (D. Br. at 10.)  Under the introductory criteria, however, only evidence relating to the time period before Plaintiff turned 22 is relevant.

[6] Because the introductory criteria of Listing 12.05 also apply to 12.05C, Plaintiff's alternative argument fails for the same reasons as his 12.05B argument.

### III.      RECOMMENDATION

Plaintiff's motion should be **DENIED**, Defendant's motion should be **GRANTED**, and the

case should be wholly **AFFIRMED**.

**SO RECOMMENDED**, on this 27th day of August, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties
in the manner provided by law.  Any party who objects to any part of these findings, conclusions
and recommendation must file specific written objections within 14 days after being served with
a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection
must identify the specific finding or recommendation to which objection is made, state the basis
for the objection, and specify the place in the magistrate judge's findings, conclusions and
recommendation where the disputed determination is found.  An objection that merely
incorporates by reference or refers to the briefing before the magistrate judge is not specific.
Failure to file specific written objections will bar the aggrieved party from appealing the factual
findings and legal conclusions of the magistrate judge that are accepted or adopted by the district
court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79
F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

16